IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| Bibi Z. RAGHBAT, | |
| Plaintiff, | Civil No. 16-2045 (RBK/AMD) |
| v. | **OPINION** |
| THE COOPER HEALTH SYSTEM, | |
| Defendant. | |

**KUGLER**, United States District Judge:

This matter comes before the Court on Defendant the Cooper Health System's ("Cooper Health") Motion for Summary Judgment. (ECF No. 29.) Also before the Court is Defendant's Motion to Strike the Declaration of LaToya Webster. (ECF No. 43.)

Cooper Health terminated Plaintiff for allegedly falsifying medical records, but Plaintiff alleges she was fired on the basis of her creed, national origin, or nationality. However, because Plaintiff has not presented any evidence of discriminatory motive and has not presented a similarly situated person who was not terminated for such actions, she has failed to establish a prima facie case of discrimination. As such, Defendant's motion for summary judgment is **GRANTED**. As for the motion to strike, the Court finds the underlying declaration would not materially affect the outcome of this disposition; it is **DISMISSED AS MOOT**.

1

## I. BACKGROUND

### A. Plaintiff's Employment

Plaintiff Bibi Z. Raghbat, a woman of Afghan descent who is a practicing Muslim, was a Critical Care Technician ("CCT") working the 7:00 p.m. to 7:30 a.m. night shift in the Progressive Care Unit ("PCU") of Cooper University Hospital. (Def. SUMF at ¶¶ 1-3.) The Cooper Health System was her employer. (*Id.*) At all times while working there, Plaintiff wore a hijab, and was the only CCT to do so during the overnight shift. (Raghbat Decl. at ¶ 69.) When Plaintiff began working for Cooper Health in July 2012 as a part-time CCT, she was initially supervised by Clinical Director MJ Tiedeken and Associate Clinical Director Brian O'Shaughnessy. (Def. SUMF at ¶ 5.) In early 2014, Kimberly Hummel became the new Clinical Director after Tiedeken went out on medical leave. (*Id.* at ¶ 6.) Plaintiff worked in a PCU with patients who had a number of ailments, including cardiac problems. (*Id.* at 4.) While working in the PCU, Plaintiff had an informal arrangement with her supervisor, Tiedeken. (Pl. Resp. SUMF at ¶ 17.) Under this arrangement, she could sometimes leave by 7:00 a.m. to attend college classes, provided her work was completed. (*Id.*)

As a CCT, Plaintiff had several responsibilities during her night shift, including taking patient's vital signs and entering them into the EPIC medical records system ("EPIC"), weighing patients and entering those weights into EPIC, recording liquids consumed and expelled by patients (known as intakes and outputs), giving patients baths, and helping nurses with feeding patients. (Def. SUMF at ¶ 8.) CCTs are primarily responsible for weighing patients. (*Id.* at ¶ 9.) As a rule, patient weights needed to be "dry weights," meaning weights taken between 5:30 a.m. and 7:00 a.m., though the parties dispute whether there was a formal policy in effect during the time Plaintiff worked for Cooper Health. (*Id.* at ¶ 10; Pl. Resp. SUMF at ¶ 10.) The stated reason

for this policy is that weights taken during this period reflect the effects of medications, particularly diuretics, on patients. (Def. SUMF at ¶ 11; Pl. Resp. SUMF at ¶ 11.)

Defendant Cooper Health maintains that during the period of Plaintiff's employment several cardiologists in the PCU complained that the weights were not being consistently recorded for their patients by the time they completed rounds between 7:00 a.m. and 10:00 a.m. (Def. SUMF at ¶ 12.) Specifically, Kimberly Hummel stated in a deposition that the physicians "had come to the leadership team . . . reporting [that] the weights were not consistently filed in the computer system." (*See* Hummel Dep. at 28:19-29:13.) Plaintiff disputes this, noting that Hummel indicated in her deposition that the weights were to be completed by 6:00—not 7:00—in the morning. (Pl. Resp. SUMF at ¶ 13.) The informal policy appears to have been that once a CCT weighed a patient, they were to enter the weight into EPIC, although the parties dispute whether CCTs were required to indicate the time when the weight was taken or whether CCTs were obliged to wake up patients to take care of them. (Def. SUMF at ¶¶ 13-14; Pl. Resp. SUMF at ¶¶ 13-14.) CCTs were also responsible for recording intakes and outputs in EPIC for all patients as instructed, and to take and record vital signs of patients before the 7:00 a.m. change of shift. (Def. SUMF at ¶¶ 15-17.)

In early January of 2014, Hummel reported to work between 6:45 a.m. and 7:15 a.m. (Def. SUMF at ¶ 18.) On arrival, she recounts that some nurses approached her and reported that the vital signs of four or five patients had not been recorded. (*Id.*) Hummel determined that the patients were assigned to Plaintiff and another CCT, and when she reviewed EPIC, she discovered that no vital signs had been recorded by Plaintiff for these patients between 7:00 a.m. and 8:00 a.m. (*Id.*) Hummel called Plaintiff to ask about this, but received no response. (*Id.* at ¶ 19.) When Plaintiff returned her call, Hummel discussed this issue with Plaintiff, who averred that she was certain she had done the required vital signs. (*Id.* at ¶ 20.) Plaintiff later called Hummel again after she had

3

logged into EPIC from home and confirmed that she had recorded vital signs. (*Id.* at ¶ 21.) Some time after, on January 31, 2014, Hummel gave Plaintiff a "coaching" related to this incident, which is a note to file demonstrating that Plaintiff had been reminded of Cooper Health's expectations that vital signs be taken during the change of shift period, which did not happen. (*Id.* at ¶ 22.) The other CCT on shift was likewise counseled on February 5, 2014 for committing a similar violation. (*Id.* at ¶ 23.)

Plaintiff also had some attendance issues at work. She received a verbal warning from Hummel for violations of Cooper Health's attendance policy on March 11, 2014. (Def. SUMF at ¶ 23.) Plaintiff had "called out" eight times during the previous year, meaning she had not appeared for work. (*Id.* at ¶ 24.) Plaintiff does not deny this, and the attendance issue came to Hummel's attention on a routine review of the attendance of all employees under her supervision in the PCU. (*Id.* at ¶¶ 26-28.) It is undisputed that this level of call-outs was a terminable offense, although Plaintiff correctly notes that it is within the discretion of Cooper Health to enforce this policy. (*Id.* at ¶ 28.) Plaintiff likewise does not dispute that many other Caucasian, non-Muslim employees were similarly disciplined by Hummel, including individuals with fewer absences than Plaintiff. (*Id.* at ¶¶ 29-32.)

### B. The Weighing Incident

On March 11, 2014, Plaintiff was on a shift scheduled from 7:00 p.m. to 7:30 a.m. the next morning, though she again emphasizes that her agreement with her former supervisor, Tiedeken, permitted her to leave at 7:00 a.m. for classes. (*Id.* at ¶ 33.) During this shift, a patient—here referred to as RMT—was assigned to Plaintiff. (*Id.* at ¶ 34.) RMT was under the care of Dr. Fredric L. Ginsberg, a cardiologist. (*Id.* at ¶ 35.) Dr. Ginsberg had ordered that RMT's weight and intakes and outputs be strictly recorded and prescribed Lasix, a powerful diuretic. (*Id.* at ¶ 36.) The parties

agree that Dr. Ginsberg's orders were to be complied with as a matter of patient safety, since the information regarding RMT's weight and intakes and outputs was needed to determine the dosage of Lasix given to the patient. (*Id.* at ¶ 37.) RMT's weight was taken upon admission to the PCU on March 11, 2014 by a registered nurse, Cecilia Polmeni, and was recorded as 88.225 kilograms at 11:26 a.m. (*Id.* at ¶ 38.) An output of 1,500 cubic centimeters of urine was recorded at 4:58 p.m. on the same day. (*Id.* at ¶ 39.) No further outputs were recorded for RMT until Nurse Polmeni returned and recorded an output of 320 cubic centimeters of urine the following morning at 7:20 a.m. on March 12, 2014. (*Id.* at ¶ 40.)

At 6:00 that same morning, Plaintiff recorded a weight of 88.724 kilograms—heavier than the previous morning. (*Id.* at ¶ 41.) Dr. Ginsberg became concerned because the records did not show any output of urine overnight and because RMT's weight had increased. (*Id.* at ¶ 42.) Dr. Ginsberg asked Nurse Polmeni about the accuracy of the weight recorded by Plaintiff, and Nurse Polmeni re-weighed RMT at 9:00 a.m. on March 12, 2014, obtaining a weight of 85.412 kilograms. (*Id.* at ¶¶ 43-44.) This was 3.12 kilograms—7.3 pounds—less than the weight recorded by Plaintiff only a few hours before, at 6:00 a.m. (*Id.* at ¶ 44.) It was also 2.81 kilograms—6.2 pounds—less than RMT's weight on admission to the PCU. (*Id.*) This discrepancy led Dr. Ginsberg to believe that the weight recorded by Plaintiff was inaccurate, particularly as his training and experience suggested patient would lose, rather than gain, weight when taking diuretics. (*Id.* at ¶¶ 45-46.) At a later deposition, Plaintiff testified that she weighed RMT and attributed the error to the scale; she has noted that the CCTs had often found the scales to be unreliable. (*Id.* at ¶ 48; Raghbat Decl. at ¶ 30.) Plaintiff has also included an affidavit (perhaps improperly, but we address that below) by LaToya Webster, a former nurse in the PCU, who avers that the scales were sometimes off. (Webster Decl. at ¶ 11.) Hummel has also admitted that the scales could be off by 1-2 pounds if

5

the scale were not "zeroed." (Pl. Resp. SUMF at ¶ 49.) But during the relevant time, there were no complaints that the scales were inaccurate and no service requests for the scales were made. (Def. SUMF at ¶ 50.)

Hummel investigated this incident. (*Id.* at ¶ 52.) She interviewed RMT about Plaintiff weighing her, but RMT stated that she had not been weighed since the day before by Nurse Polmeni. (*Id.* at ¶ 53.) Hummel maintains that she had no reason to doubt RMT. (*Id.* at ¶ 54.) Hummel also spoke with Nurse Polmeni and Elizabeth Mallane, Clinical Educator for the Progressive Care and Coronary Intermediate Care Unit, both of whom had spoken to RMT. (*Id.* at ¶ 55.) Both Polmeni and Mallane told Hummel that RMT had told them that Plaintiff had not weighed RMT.[1] (*Id.* at ¶ 55.) RMT has since passed away, but Plaintiff disputes—without evidence—that these conversations ever occurred. (Pl. Resp. SUMF at ¶ 55.) During this same shift, Plaintiff was assigned to four other patients. (*Id.* at ¶¶ 56-59.) As with RMT, their respective doctors had ordered their weight and intakes and outputs to be recorded. (*Id.*) All were recorded at 6:00 a.m. sharp, the same time as RMT, a fact which later led Hummel to believe that the weights were falsified. (*Id.* at ¶¶ 56-60.)

The precise policy for weighing patients is disputed. Plaintiff maintains that the only policy in place at the time of March 11, 2018 night shift was that patients had to be weighed before 6:00 a.m.; inferentially, she appears to argue that the *recording* of such weights could be done at a subsequent time. (*See, e.g.*, Compl. at ¶ 34; Raghbat Decl. at ¶ 16.) Plaintiff maintains that under her former manager Tiedeken, the policy was "flexible" and that CCTs were advised to take the weights of patients when the patients were awake and when it was convenient for the patients. (Raghbat Decl. at ¶¶ 16-17.) The Webster declaration indicates substantially the same. (*See*

---

[1] We address Plaintiff's objections that these statements are inadmissible hearsay below.

Webster Decl.) A February 5, 2014 email from Elizabeth Mallane also indicates that "all weights are to be completed by 0600." (*Id.* at ¶ 19.)

### C. Plaintiff's Termination

Hummel, O'Shaughnessy, and Plaintiff met on March 17, 2014 to discuss the issues concerning RMT. (*Id.* at ¶ 61.) Plaintiff admitted that she had taken patient records during the night but recorded them at 6:00 a.m. (*Id.* at ¶ 62.) The parties agree that this occurred, and primarily dispute what to term this: Plaintiff appears to consider it a common practice among CCTs, while Cooper Health refers to it as "falsification." Plaintiff also maintains that she had "tech sheets" prepared for the patients on her shift, but Hummel was unable to find them. (Raghbat Decl. at ¶¶ 49-50.) Plaintiff attributes this absence to the regular shredding of documents. (Raghbat Decl. at ¶ 51.)

Another individual was counseled with respect to this incident. Plaintiff's supervisor on shift, Beth Ann Stauffer, a registered nurse, a Caucasian woman who Hummel had no reason to believe was Muslim, received a coaching on March 13, 2014 for her failure to ensure that Plaintiff recorded weights and intakes and outputs properly. (*Id.* at ¶ 67.) A "coaching form" completed by Hummel appears to have summarized this meeting, stating that Stauffer should "collaborate with tech to develop process" and that the recording of weights and intakes and outputs was a "joint responsibility." (*See* Def. Br. Ex. R.) Cooper Health states that Nurse Stauffer received a coaching because she had not previously been disciplined. (Def. SUMF at ¶ 67.)

On March 24, 2014, Plaintiff met with Hummel and O'Shaughnessy. (Def. SUMF at ¶ 63.) Plaintiff was advised that her employment with Cooper Health was terminated for falsifying medical documentation. (*Id.* at ¶ 64.) Hummel believed that Plaintiff had not actually weighed RMT during her shift and had entered a false weight in RMT's records. (*Id.* at ¶ 65.) Hummel

7

reached this conclusion from her discussions with two different staff members and because the weight entered could not have been accurate. (*Id.* at ¶ 65.) Although Cooper Health argues it had no choice but to terminate Plaintiff for this violation, Plaintiff notes that the relevant corporate policy provides for "extenuating circumstances" and she argues this falls within such circumstances. (*Id.* at ¶ 66.)

After her termination, Plaintiff filed a grievance with Cooper Health. (*Id.* at ¶ 68.) A Cooper Human Resources employee, Michelle Silver, held a grievance meeting, with Plaintiff and Hummel present. (*Id.* at 69.) Ultimately, Plaintiff's termination was upheld. (*Id.* at ¶ 70.)

### D. The Instant Case and Alleged Discrimination

Plaintiff subsequently filed suit in this Court, challenging the legality of her termination. Plaintiff brings two claims under the NJLAD. She alleges Cooper Health has engaged in discriminatory "unlawful employment practices" as defined in N.J. Stat. Ann. § 10:5-12, proceeding on a theory of disparate treatment (Count I). She separately alleges liability for the same under a theory of respondeat superior (Count II). With respect to both counts—functionally identical for purposes of this Court's analysis—Plaintiff alleges she was fired because of her Muslim faith, national origin, and nationality.

Plaintiff's complaint alleges that she was not given fair notice of a change in policy when other individuals not of her faith, national origin, or nationality were warned in advance of such change, but no such evidence has been presented on summary judgment. (Compl. at ¶ 36.) Plaintiff also notes that another CCT who was Muslim, Diana Bey, was once terminated by Hummel. (Def. SUMF at ¶ 71.) The stated reason for Bey's termination was that she had been previously disciplined and continued to be late and absent. (*Id.* at ¶ 72.)

## II.　JURISDICTION

Plaintiff, a Georgia citizen, has sued Defendant, a New Jersey non-profit corporation, under the anti-discrimination laws of New Jersey, alleging damages in excess of $75,000. This case thus falls within the Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332.

## III.　SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). A genuine dispute of material fact exists if the evidence is such that a reasonable jury could find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When a court weighs the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080 (3d Cir. 1996). The moving party may satisfy its burden either by "produc[ing] evidence showing the absence of a genuine issue of material fact" or by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

If the party seeking summary judgment makes this showing, it is left to the nonmoving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Furthermore, "[w]hen opposing summary

judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" *Corliss v. Varner*, 247 F. App'x 353, 354 (3d Cir. 2002)).

In deciding the merits of a party's motion for summary judgment, the Court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

## IV. DISCUSSION

### A. The 56.1 Statement and Evidentiary Objections

We begin by noting that Plaintiff's Responsive Statement of Material Facts has many legal arguments that have confounded its utility to the Court. As Local Civil Rule 56.1 makes clear, statements of material fact "shall not contain legal argument or conclusions of law." L. Civ. R. 56.1(a). After all, the Rule requires a statement of material *fact*, not one of material *fact and law*—the purpose of the document is to clarify the facts of the case to assist the Court in deciding whether summary judgment may be granted. Legal arguments are inappropriate; "[t]he statement of material facts is not the vehicle for conveying these points." *Teubert*, 193 F. Supp. 3d at 576. And although Plaintiff is correct that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible evidence," Fed. R. Civ. P. 56(c)(2), this must be done in a brief. While the Court will consider these arguments where coherent or equitable, the nature of many of the objections merits independent analysis in a brief or a motion to strike and, in the absence of those, will not be considered.

Many of these arguments are repeated in scattershot form in Plaintiff's briefing. Among the many arguments raised by Plaintiff are that various factual representations by Defendant

Cooper Health are "opinions" or "hearsay." As to the set of "opinion" objections, Plaintiff argues the Court must disregard Hummel's opinion that Plaintiff falsified medical records. We disagree: "these 'opinions' can be undisputed material facts insofar as they provided Defendant with a legitimate, non-discriminatory reason for Plaintiff's termination." *Teubert v. SRA Int'l, Inc.*, 192 F. Supp. 3d 569, 576 (D.N.J. 2016). In other words, Hummel's opinions are admissible evidence when they set forth her reasons for firing Plaintiff. The same can be said with respect to statements or opinions by Dr. Ginsberg, which were relied on by Hummel in her decision to fire Plaintiff.

Plaintiff also objects to Dr. Ginsberg's certification, arguing it is impermissibly being offered in his capacity as an expert, rather than as a fact witness. We agree that the certification in question offers opinion evidence—such as Dr. Ginsberg's opinions about the medical impossibility of patient RMT having large fluctuations of weight—which resembles expert testimony. But as a practical matter, the Court need not determine whether RMT's weight was or was not accurately recorded, only that the opinion was relied on by Hummel. The issue in this case is not whether Dr. Ginsberg erred, or whether Hummel wrongly relied on his opinion; it is whether Plaintiff was fired for unlawfully discriminatory reasons. Thus, for the purposes of evaluating whether Cooper Health discriminated against Plaintiff, Dr. Ginsberg's recollections are presented in his capacity as a fact witness, and we construe them as such. *See, e.g.*, *Abalos v. City of Toledo*, 2014 WL 12584327, at *1 (N.D. Ohio June 9, 2014) (finding doctors who were going to testify only to first-hand observations and treatment of patient were fact witnesses, not expert witnesses); *Richardson v. Consol. Rail Corp.*, 17 F.3d 213, 218 (7th Cir. 1994) (same). As Fed. R. Civ. P. 46(c)(4) spells out, an affidavit "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Dr. Ginsberg is plainly capable of testifying to his own lived experience.

Plaintiff also objects to Dr. Ginsberg's certification because it was not produced in discovery. This is also without merit. Rule 56 allows a party to support a motion for summary judgment with an affidavit created solely for the purpose of supporting summary judgment, providing the affiant was an individual disclosed in discovery. *See Coach v. Armstrong Int'l, Inc.*, No. 12-03611, 2014 WL 6743321, at *1 (E.D. Pa. Sept. 25, 2014).

We turn to Plaintiff's numerous hearsay objections, though we only consider those objections that are necessary to reach a decision in this matter. Plaintiff strongly objects to out-of-court statements concerning what Dr. Ginsberg, Nurse Polmeni, Elizabeth Mallane, and patient RMT told Hummel about Plaintiff not weighing RMT. However, these statements are not being offered to prove the truth of their contents. Nor, with respect to some of Plaintiff's other objections, are they being offered to show that the flow of urine out of patients did in fact result in a determinable weight loss, that Dr. Ginsberg has proven to a medical certainty that he knew the weights were wrong, or that Hummel was factually correct in her assessments of Plaintiff's alleged deceptions. Rather, this evidence is being offered to prove the effect on the state of mind of Cooper Health employees, namely Plaintiff's supervisor, Hummel. "This is an acceptable non-hearsay use for this evidence where, as in discrimination cases, what matters is not 'the truth of the allegations against plaintiff' but instead 'what motivated the employer.'" *Teubert*, 192 F. Supp. 3d at 578 (citing *McPherson v. New York City Dept. of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006)); *see also Fahnestock v. Carlisle Reg'l Med. Ctr.*, 659 F. App'x 75, 78 (3d Cir. 2016) (same). For purposes of determining whether Plaintiff was fired for discriminatory reasons, this evidence is not hearsay.

### B. Plaintiff's NJLAD Claims

The NJLAD is an exception to the normal rule in New Jersey that an employer may fire an employee for good reason, bad reason, or no reason at all under the employment-at-will doctrine.

*Russelman v. ExxonMobil Corp.*, 2012 WL 3038589, at *3 (D.N.J. July 25, 2012) (citing *Witkowski v. Thomas J. Lipton, Inc.*, 136 N.J. 385, 396 (N.J. 1994) (internal citations omitted)) Discrimination claims under the NJLAD are analyzed under the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see Tourtellote v. Eli Lilly & Co.*, 636 Fed. App'x 831, 842 (3d Cir. 2016) ("This Court's discrimination inquiry is the same for claims filed under Title VII and the NJLAD[,] as the New Jersey statute borrows the federal standard set forth in *McDonnell Douglas*"). Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of discrimination. *Tourtellotte*, 636 Fed. App'x at 848. After a plaintiff demonstrates a prima facie case of discriminatory discharge, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action. *Id.* at 842. "Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Terry v. Borough*, 660 Fed. App'x 160, 163 (3d Cir. 2016) (quoting *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999)).

An NJLAD discrimination case starts with the prima facie case. To prove a prima facie case of discrimination, a plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of discrimination. *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410-11 (3d Cir. 1999). When determining whether a plaintiff has established a prima facie case of discrimination, the Court focuses on whether Plaintiff has proffered evidence suggesting that she was treated differently than similarly situated employees who are not within her protected class. *See, e.g.*, *Didier v. Dow Jones Co.*, 2014 WL 4094920, at

*14 (D.N.J. Aug. 15, 2014) (quoting *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 366 (3d Cir. 2008) ("Evidence of discrimination is commonly presented in the form of evidence of disparate treatment, 'whereby a plaintiff shows that [he or she] was treated less favorably than similarly situated employees' of a different race.")). As the Third Circuit has explained,

> In determining whether similarly situated nonmembers of a protected class were treated more favorably than a member of the protected class, the focus is on the particular criteria or qualifications identified by the employer as the reason for the adverse action. The employee's positive performance in another category is not relevant and neither is the employee's judgment as to the importance of the stated criterion. Furthermore, the court does not subjectively weigh factors it considers important. Rather, the plaintiff must point to evidence from which a factfinder could reasonably infer that the plaintiff satisfied the criterion identified by the employer or that the employer did not actually rely upon the stated criterion.

*Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 647 (3d Cir. 1998). But "there is no bright-line rule for determining who is a 'similarly situated' employee." Rather, the trial judge must determine what criteria is most relevant after making a sensitive appraisal of the facts. *Jason v. Showboat Hotel & Casino*, 329 N.J. Super. 295, 305 (App. Div. 2000).

Defendant argues that Plaintiff has failed to establish a prima facie case because she has not produced evidence that other similarly situated employees outside her protected class did not suffer similar adverse employment actions. Plaintiff presents a number of counter examples, most significantly Cooper Health's allegedly disparate treatment of Nurse Stauffer.

    *1. Nurse Stauffer*

Plaintiff emphasizes that her nurse supervisor, Beth Ann Stauffer, was counseled, but not terminated, for her role in the alleged failures to record that resulted in Plaintiff's termination. This, Plaintiff maintains, is disparate treatment sufficient to make out a prima facie case. We must therefore determine whether Stauffer is "similarly situated . . . in all relevant respects." *Fawole v. Newark Beth Israel Hosp.*, 2016 WL 4803171, at *5 (D.N.J. Sept. 14, 2016) (citing *Wilcher v.*

*Postmaster Gen.*, 441 Fed. App'x 879, 881-82 (3d Cir. 2011)). We agree with Plaintiff that this is not a formalistic inquiry that prevents comparison of one job title with another; the mere fact that Nurse Stauffer is a nurse, and not a CCT, does not in and of itself render her incomparable. But there are nonetheless some significant differences between the two.

The criteria identified by Hummel for Plaintiff's termination—and thus the crux of our inquiry—was Plaintiff's alleged falsification of medical records. On the night in question, the record indicates that both Plaintiff and Nurse Stauffer had "joint responsibility" to record intakes and outputs and to record the weights of patients. After the incident—we do not make any decision as to what happened—Hummel apparently believed someone had erred, and counseled Nurse Stauffer on March 13, 2014. A few days later, on March 17, she counseled Plaintiff. And a week after that, on March 24, 2014, Hummel fired Plaintiff for falsification of medical records. Cooper Health maintains that it did not fire Nurse Stauffer for this because she had not been disciplined before, while Plaintiff had been counseled twice before for her absenteeism and for failing to record vital signs. Furthermore, Nurse Stauffer was a supervisor for Plaintiff, while Plaintiff was a subordinate, and their jobs were thus fundamentally different, even if they shared some similarities.

In arguing against these differences, Plaintiff directs this Court's attention to *Savoie v. Lawrenceville School*, 2013 WL 1492859 (App. Div. 2013). *Savoie* concerned a homosexual school teacher who was forced to resign after administrators developed fears that he was sharing pornographic images or films from a computer in his basement, thereby risking the school's reputation for propriety. Although the facts of the case are as baroque as they are salacious, for our purposes it is sufficient to say that a superior of the plaintiff had had an extramarital affair, but had not been terminated. *Id.* at *7. An expert also concluded that the plaintiff had intentionally altered

15

his computer by deleting images, complicating proof of whether he had in fact circulated sexually explicit images online, an alleged violation of school policy. *Id.* at *8. Ultimately, the trial court granted summary judgment in favor of the school, finding that the plaintiff's manager had a good faith belief "void of ill will towards homosexuality at the moment of his confrontation" with plaintiff and that the reports of plaintiff's pornographic activities were credible enough to merit termination. *Id.* at *9.

The Appellate Division reversed. It found, among other things, that an inference of disparate treatment could be shown when a school dean "treated a high ranking administrator differently from the way she treated [the teacher]" by knowingly withholding from the school's trustees information about an extramarital affair that could have resulted in termination. *Id.* at *13. The school policy violations in question—an extra-marital affair and the sending of sexually explicit images online—raised similar concerns about their effects on the school's reputation. *Id.* To act on one, and not the other, presented a jury question on whether Plaintiff was indeed fired for sending sexually explicit images or, as he alleged, whether that termination was influenced by animus toward his sexual orientation.

Plaintiff points to *Savoie* that this is proof that a supervisor should be found to be "similarly situated." That, however, was not the only reason behind the Appellate Division's reversal of the trial court's determination. It also noted that the plaintiff was "a long-term, distinguished faculty member with an unblemished record" and that administrators had made disapproving comments about the plaintiff's lifestyle. *Id.* at *13. The court noted that "[d]iscriminatory comments made by one with input into the decision-making process are not stray remarks," and that they are evidence of a possible discriminatory motive. *Id.* at *13 (citing *Grasso v. West New York Bd. of Educ.*, 364 N.J. Super 109, 118 (App. Div. 2003)).

16

Rather than strengthen Plaintiff's case, *Savoie* only highlights its deficiencies. Nurse Stauffer and Plaintiff are similar in that they both worked on the same shift and were both counseled for irregularities that allegedly occurred on that shift. But they differ in several important respects. Unlike in *Savoie*, where a superior and a subordinate were compared for similar alleged sexual improprieties outside the scope of their employment, this case concerns a superior and a subordinate whose conduct is within the scope of their employment. Nurse Stauffer's duty of oversight is a different kind of work than Plaintiff's duties to weigh and record intakes and outputs. Indeed, Plaintiff has not presented evidence that Nurse Stauffer was obliged to weigh patient RMT, while it is conceded that Plaintiff was so obligated. Nurse Stauffer was not suspected by doctors of falsifying records, while Plaintiff was. Plaintiff has not presented evidence that Nurse Stauffer recorded the weights of five patients at 6:00 a.m. sharp, while Plaintiff concedes that she did. Nurse Stauffer did not represent that she had weighed patient RMT, while Plaintiff claims that she did, despite Hummel hearing otherwise from the patient and other coworkers. As for the other issues factoring into whether discriminatory intent was a jury question in *Savoie*, they are conspicuously absent here. Plaintiff has not presented any evidence that someone has made a discriminatory remark to her, and Plaintiff, unlike the teacher in *Savoie* (and unlike Nurse Stauffer as well), had past disciplinary issues. There are far more differences than similarities between Nurse Stauffer and Plaintiff. We therefore conclude that Nurse Stauffer was not similarly situated to Plaintiff and cannot anchor a disparate impact claim of discrimination.

   2. *Other individuals*

Plaintiff identifies only one other person by name who was subject to discipline at some point: Diana Bey. As best the Court can tell the sole reason Bey has been identified is because she is a practitioner of the Muslim faith who also happened to lose her job, for reasons—namely,

absenteeism—having nothing to do with the falsification of medical records. She is not a similarly situated person.

More generally, Plaintiff argues that other employees—they have not been identified—followed the same record-keeping practices that led to Plaintiff's termination. This is insufficient. *See Murray-Sims v. New Jersey Transit Corp.*, 2014 WL 6991906, at *16-18 (D.N.J. Dec. 10, 2014) (holding that not showing that other trainees were sitting in a training session with their eyes closed, as plaintiff had done, was a failure to set forth a prima facie case); *Mojica v. Advance Auto Parts, Inc.*, 2016 WL 107844, at *5 (E.D. Pa. Jan. 11, 2016) (holding that merely identifying comparators as "white guys" was not sufficient to establish a prima facie case); *Geaney v. Computer Sciences Corp.*, 2005 WL 1387650, at *3-4 (D.N.J. June 10, 2005) (holding that plaintiff failed to establish a prima facie case of discrimination because she failed to establish that male employees who similarly failed to meet sales goals were treated differently); *Ferrell v. Harvard Industries, Inc.*, 2001 WL 1301461, at *17 (E.D. Pa. Oct. 23, 2001) (holding that vague allegations that other unnamed individuals committed similar workplace violations is not sufficient to establish prima facie case). However, Hummel states she terminated Plaintiff on a more particularized basis than the theory favored by Plaintiff: Hummel believed Plaintiff did not weigh patient RMT at all and instead falsified medical records. And as with Nurse Stauffer, no one has been identified who faced the same accusation.

In sum, Plaintiff has presented nothing to show Cooper Health unlawfully discriminated against her. Her case turns instead on an allegation that Hummel, Dr. Ginsberg, and others were mistaken when they concluded Plaintiff falsified medical records. Plaintiff's efforts to show that her conduct was standard practice do not disturb this conclusion. Plaintiff's manager concluded, rightly or wrongly, that she had falsified medical records. In the absence of discrimination or other

authority, an employer in New Jersey can terminate employment, *even for a bad reason*. *Russelman*, 2012 WL 3038589, at *3. Hummel could be utterly mistaken and completely wrong, but provided her actions were not unlawfully discriminatory, that would make no difference for an at-will employee. We therefore find that Plaintiff has failed to present evidence sufficient to withstand summary judgment on her claim of disparate treatment under the NJLAD.

V.     **THE MOTION TO STRIKE**

Cooper Health has moved to strike the declaration of LaToya Webster on the grounds that she was not disclosed as a potential witness. *See* Fed. R. Civ. P. 26(a)(1)(A)(i) ("a party must, without awaiting a discovery request, provide to the other parties . . . the name . . . of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses"). It is undisputed that Webster was not disclosed during discovery, but Plaintiff maintains her declaration does not prejudice Cooper Health because she raises substantially the same issues that another witness, who was disclosed, would have raised. The Webster declaration recites Plaintiff's position, stated in her deposition and elsewhere, that the practice of recording patient vitals was flexible, that the scales were sometimes off, and that she was a reliable employee, among other things. What it does not do, however, is present evidence of discriminatory intent or provide a basis, save in the most generalized of terms, for the Court to conclude that someone who was similarly situated was not terminated for the same offense. It therefore does not materially affect the outcome of this case, because it does not address that evidentiary deficiency. Defendant's motion to strike is accordingly **DISMISSED AS MOOT**.

## VI. CONCLUSION

As Plaintiff has not presented evidence of disparate treatment, Defendant's motion for summary judgment is **GRANTED** and its motion to strike is **DISMISSED AS MOOT**. An order follows.


Dated:  May 16, 2018                                             s/ Robert B. Kugler
                                                                 ROBERT B. KUGLER
                                                                 United States District Judge